IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| EM RABELAIS, | |
| Plaintiff, | Case No.: 24-cv-5723 |
| v. | Judge Edmond E. Chang |
| BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS, | Magistrate Judge Heather K. McShain |
| Defendant. | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'
COMBINED MOTION TO PARTIALLY DISMISS PURSUANT
TO RULE 12(b)(6) AND TO STRIKE PURSUANT TO RULE 12(f)**

# **TABLE OF CONTENTS**

I.  *FACTUAL ALLEGATIONS* ...................................................................................................... **1**

II.  *ARGUMENT* ........................................................................................................................... **1**

  **A.  Plaintiff's Federal Hostile Work Environment Claim is Not Time Barred Because Events Discounted by Defendant Are Relevant. .......................................................................................................... 1**

    1.  Events Referable to Gender Identity/Sex and Retaliation Occurred Within the 300 Days Prior to the EEOC Charge ......... 1

    2. University administrators ignored her complaints ..................................................................... 2

    3. University administrators retaliated for her complaints................................................................ 3

    4. She had been misgendered on various occasions. ..................................................................... 3

    2.  Facially Sex-Neutral Incidents Are Probative of a Hostile Work Environment. ....................................... 5

    3.  Harrassment Targeted at Someone Else Can Still Support Plaintiff's Hostile Work Environment Claim. ............................. 8

    4.  Same Employment Practice .......................................................................................... 10

    5.  Why Misgendering a Transgender Employee Consistently Despite the Passage of Time is part of a Hostile Work Environment. .......................................................................................................... 11

  **These events, occurring with the 300 day limits, will, upon repleading, provide the necessary connection to the other prior events. .................................................................................................. 12**

    6.  Evidence That Other Acts and Words Were Motivated By Sex and/or Gender Identity................................... 13

    7.  Anti-Trans and Retaliatory Purpose of Charge Against Rabelais ..................................................... 14

  **B.  Plaintiff pleads conduct that rises to the level of a hostile work environment. ............................ 15**

    1.  Required Nexus With Gender Identity/Sex and Retaliation ........................................................... 15

    2.  The Reasonable Transgender Woman Standard ...................................................................... 16

  **C.  The Failure to Obtain an IDHR Notice of Right to Sue As a Result of the Agency's Misleading Plantiff as to the Ability to Obtain It Does Not Deprive the Court of Jurisdiction. ............................................ 17**

I. <u>**FACTUAL ALLEGATIONS**</u>

Plaintiff does not have anything to add to the facts as stated by Defendant.

II. <u>**ARGUMENT**</u>

A. <u>**Plaintiff's Federal Hostile Work Environment Claim is Not Time Barred Because Events Discounted by Defendant Are Relevant.**</u>

1. <u>**Events Referable to Gender Identity/Sex and Retaliation Occurred Within the 300 Days Prior to the EEOC Charge**</u>

Plaintiff's complaint includes allegedly discriminatory events both prior to and subsequent to the federal statute of limitations. As Defendant correctly notes, the date on which this 300 day period commenced was December 17, 2020. Defendant also argues correctly that, under *Amtrak v. Morgan*, 536 U.S. 101, 122 (2002), in order to prove a hostile work environment at least one event referable to the claim must have occurred within the statutory time period in order to take into account instances of hostility prior to the 300 days. *Def. Br.* 10-11. However, Defendant makes three arguments that are incorrect under current case law:

1. Defendant asks the Court to strike any allegations referencing disability, national origin and race discrimination as unrelated to her discrete claims regarding gender identity/sex and retaliation, irrelevant and beyond the scope of Plaintiff's EEOC charge. Id. at 6-7.

2. Defendant asks the Court to strike any allegations regarding statements by faculty members regarding national origin, disability or race, unless the Plaintiff identifies clearly which faculty member made the statement. Id. at 7.

3. Defendant requests that the Court strike any allegations that Defendant considers beyond the scope of the EEOC charge and that do not allege the same conduct, the same people and the same specific employment practices. Def. Br. 8-9.

As to Point 1, a look at the case law governing hostile work environment claims, reveals that, contrary to Defendant's contention, it is not necessary to state a discrete claim for each protected characteristic in order to include in the Complaint events involving them. Rather, one may bring into the Complaint other protected characteristics not part of a discrete claim. *Brown v. Ferrara Candy Co.*, 2023 WL 6519973, at *4 (N.D. Ill. 2023), citing *Masud v. Rohr-Grove Motors, Inc.*, 2015 WL 5950712, at *4 (N.D. Ill. 2015), *White v. Fid. Brokerage Servs.*, LLC, 2019 WL 6052398, at *4 (N.D. Ill. 2019); *Shazor v. Prof'l Transit Mgmt.*, 744 F.3d 948, 958 (6th Cir. 2014) (rejecting separation of hostile work environment by characteristic and observing "the realities of the workplace, let alone the purpose of Title VII, will not allow such an artificial approach"), and *Lam v. Univ. of Haw.*, 40 F.3d 1551, 1562 (9th Cir. 1994) ("[W]here two bases for discrimination exist, they cannot be neatly reduced to distinct components"). Thus, Defendant is incorrect that harassing comments not springing from the discrete claims in the Complaint must be stricken as irrelevant. Therefore, the allegations referencing disability, national origin and race discrimination are, in fact, relevant to her claim of hostile work environment.

As to scope of the charge in Point 1, Defendant argues that the following should have been included in the EEOC charge in order for them to be actionable:

1. Plaintiff making complaints of race and national origin discrimination against students and faculty members
   - Plaintiff's charge stated there were "requests from management that I censor my opposition to racism." (p.2, next to last bullet) Obviously these complaints were not about Plaintiff, as she is white and did not suffer discrimination because of her race, but about racism occurring to others.

2. University administrators ignored her complaints

   - Plaintiff's charge states that when she complained to her Department Chair Dr. Patil about assault by Ms. Reynolds and Ms. Carter, Dr. Patil stated that "it

2

didn't matter" what Ms. Reynolds or Ms. Carter had done. (p.1, 11th bullet from the bottom).

- Plaintiff's charge states that Dean Finnegan informed Plaintiff that she was unable to do anything to address the transphobic assault by Ms. Carter and Ms. Reynolds. (p.1, next bullet)

- Plaintiff's charge states that she did not hear from OAE for two months after her complaint to that body. (p.1, next bullet)

Ms. Truelove of HR told Plaintiff that she didn't think the assault "was a big deal," and that she did not believe UIC had a problem with transgender or disability discrimination because "others don't report it often" (p.1, next bullet)

3. University administrators retaliated for her complaints.

- Plaintiff's charge states that the day after she complained about the assault to Dean Finnegan, Department Chair Dr. Patil charged Plaintiff with a violation of the University's Code of Conduct on the basis that she had used the word "fucking" in the context of the assault on October 24, 2018.

- Plaintiff's charge states that her use of the listserv was curtailed although others had used it similarly, and that this was in retaliation for her prior complaints.

4. She had been misgendered on various occasions.

- Plaintiff's charge states that staff members misgendered her, referring to her as "him" and "Sir" and they "did not care" what her pronouns were.

- Plaintiff's charge states that Dean Finnegan, Dr. Patil, and Amy Truelove of HR stated that the misgendering was "not a big deal."

But a charge need not explicitly state every incident alleged to be a part of a hostile work environment in order to plead them in the Complaint. Rather, a claim of termination in a charge does not carry along with it unenumerated claims different in kind, such as failure to accommodate or hostile work environment. However, if the charging party states that she asked for an accommodation, then a claim for failure to accommodate is implied. *Malcorvian v. Cnty. of Cook*, 2024 WL 1530473, at *3 (N.D. Ill. 2024) (distinguishing Green v. Nat'l Steel Corp., Midwest Div., 197 F.3d 894, 897–98 (7th Cir. 1999); Riley v. City of Kokomo, 909 F.3d 182, 189–90 (7th Cir. 2018)). And if the EEOC investigative file shows that the EEOC specifically looked into a failure to accommodate claim, then a failure to accommodate claim falls within

3

the scope of the EEOC charge. *Id.* The terms "like" and "reasonably related" are judged by a "lenient standard." *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1111 (7th Cir. 1992) (Charge complaining about sex-segregated job classifications supported claims of discriminatory hiring, recruiting, transfer and promotion policies). Here, Plaintiff's charge provides the essential information about the types of discrimination and hostility that she suffered there.

Nor is it necessary that the Plaintiff be the target of all instances of hostility for those incidents to support her claim in the Complaint. *Scaife v. U.S. Dep't of Veterans Affs.*, 504 F. Supp. 3d 893, 906 (S.D. Ind. 2020), aff'd sub nom. *Scaife v. United States Dep't of Veterans Affs.*, 49 F.4th 1109 (7th Cir. 2022), citing *Smith v. Ne. Illinois Univ.*, 388 F.3d 559, 567 (7th Circuit 2004). The analysis and evaluation of whether a complaint states a plausible claim for hostile work environment does not proceed by evaluating separately each event or category of event. Rather, the claim is to be evaluated in the totality of the circumstances. *Masud* at *4 (citing *Hafford v. Seidner*, 183 F.3d 506, 514–15 (6th Cir. 1999) and *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415–17 (10th Cir. 1987) ("[I]ncidents of racial harassment which may, by themselves, be insufficient to support a racially hostile work environment claim can be combined with incidents of sexual harassment to prove a pervasive pattern of discriminatory harassment in violation of Title VII.")). Other courts have also so held.   Accord Whidbee v. Garzarelli, 223 F.3d 62 (2d Cir. 2000) ("[A] plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim."); Perry v. Ethan Allen, Inc., 115 F.3d 143, 150 (2d Cir.1997) ("evidence of the general work atmosphere is relevant."); Hernandez v. Yellow Transp., Inc., 670 F.3d 644, 653 (5th Cir. 2012)( harassment of other women "[can be] relevant to a hostile work environment claim."); Dominguez-Curry v. Nevada Dept. of Transportation, 424 F.3d 1027,

1036 (9th Cir. 2005) ("harassment directed at coworkers can contribute to a hostile work

environment even when plaintiff is not the target"); Reeves v. C.H. Robinson Worldwide, Inc.,

594 F.3d 798, 811 (11th Cir. 2010) (en banc) ("Hostility not directed at plaintiff, but directed at

her "target group" (the group sharing her protected trait), may nevertheless support the

plaintiff's hostile environment claim."); *Cruz v. Trane Inc.*, No. 19-07324, 2022 WL 1442158,

at *4 (D.N.J. May 5, 2022) (Plaintiff "need not be the target of harassing conduct" to support a

claim for hostile work environment.); *Montgomery v. Prisma Health*, 2024 WL 449274, at *12

(D.S.C. 2024) (awareness of racial harassment of others, "bolstered the totality of the

circumstances present to add to the severity and pervasiveness of conduct against him."). Thus,

Defendant's argument is incorrect the Court must strike as irrelevant incidents of harassment, of

which Plaintiff is aware, not directed against the Plaintiff.

Plaintiff has requested the right to replead. In the Amended Complaint, Plaintiff would

attach the notes of the EEOC investigator's interview with the Plaintiff to the complaint. This

would show that the topics which Defendant complains are missing from the charge and the

investigation were, in fact, investigated.

## 2. <u>Facially Sex-Neutral Incidents Are Probative of a Hostile Work Environment.</u>

Defendant contends that facially sex-neutral incidents alleged in the Complaint should

be stricken because they do not have a sexual character, and are irrelevant other than to blacken

the character of various administrative and staff members of Defendant. What Defendant fails to

appreciate, however, is that the Seventh Circuit has "underscored" that conduct need not have

been explicitly sexual or racial in order to create a hostile environment[;] [t]he complained of

conduct must have either a sexual or racial character or purpose to support a Title VII claim.

*Hardin v. S.C. Johnson & Son, Inc.,* 167 F.3d 340, 345 (7th Cir. 1999) (addressing claims of

5

hostile work environment based on race and based on sex). See also *Cole v. Bd. of Trustees of Northern Illinois Univ.*, 838 F.3d 888, 896 (7th Cir. 2016) ("[F]orms of harassment that might seem neutral in terms of race (or sex or other protected status) can contribute to a hostile work environment if other evidence supports a reasonable inference tying the harassment to the plaintiff's protected status.").

In *Hardin*, the Seventh Circuit used this principle to determine that the facially sex-neutral remarks and actions could not have had the purpose of sex discrimination because the Plaintiff was not singled out for abusive verbal treatment. In fact, the supervisor "cursed at all employees on the line, white and black, male and female. This is supported by the depositions of nearly everyone who testified; it is undisputed that [he] was a crude individual who treated all of his coworkers poorly." *Id.* at 346. Thus, we must consider not only the *character* of the remarks and actions, but also their *purpose*. According to the Plaintiff's allegations in the Complaint, the sex-neutral remarks and actions had the purpose of harassing and retaliating against Plaintiff because of her sex, gender identity and related characteristics. From September 2018 until removal from her position in August 2021, Plaintiff was regularly subjected to numerous hostile acts, including, as detailed in the Complaint, assault, reasonable fear of physical injury, discriminatory statements, and verbal epithets, *all based on sex, gender expression and gender identity*. Complaint ¶ 111 (alleging that the various incidents after coming out were motivated by gender identity).

Plaintiff included these incidents because, as *Hardin* teaches, they form a part of the hostile environment, if, as alleged, they were motivated by her coming out as transgender. *Id.* ¶ 4 (alleging that incidents began occurring after she came out as transgender). One can reasonably understand that pushing a co-worker into a set of lockers may have something to do

6

with the epithet that he stated at the same time; the two cannot be separated into different

instances, neither of which constitute a hostile work environment when viewed in isolation. For

example, in the present case, Plaintiff included in the Complaint an incident that involved

being confronted by two staff members, who crowded her and blocked her path to the gender

neutral restroom for approximately five to seven minutes, and made her frightened for her

safety because of her disability that required walking with a cane. *Id.* ¶ 29-35 (describing the

physical aspects of the confrontation and Plaintiff's state of mind). These details were not

included because Plaintiff wished to assert *sub rosa* a complaint for disability discrimination.

They were included because, even though being crowded by the staff members and fearing for

her safety involved her disability, and was sex-neutral, she alleged the staff members' actions

had as their *purpose* to harass her because of her gender identity. Thus, all the incidents alleged

in the complaint, occurring after she came out in September 2018, even sex-neutral ones, are

relevant to the hostile work environment because of sex and gender identity.

> We have specifically held, however, that "[b]ecause the crucial inquiry focuses on the
> nature of the workplace environment as a whole, a plaintiff who herself experiences
> discriminatory harassment need not be the target of other instances of hostility in order
> for those incidents to support her claim."  Id.;  see also Perry v. Ethan Allen, Inc., 115
> F.3d 143, 150 (2d Cir.1997) ("Since one of the critical inquiries with respect to a hostile
> environment claim is the nature of the environment itself, evidence of the general work
> atmosphere is relevant.").

Whidbee v. Garzarelli, 223 F.3d 62 (2d Cir. 2000). Hostility not directed at plaintiff, but

directed at her "target group" (the group sharing her protected trait), may nevertheless support

the plaintiff's hostile environment claim. Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d

798, 811 (11th Cir. 2010) (en banc).

> *"Hafford* explicitly recognized that plaintiff's race and religion claims may be
> related to the extent plaintiff experienced discrimination for being a "black
> Muslim," and it directed the trial court on remand to consider "the possibility
> that the racial animus of plaintiff's co-workers was augmented by their bias
> against his religion." *See Hafford,* 183 F.3d at 514–15 (citing *Hicks v. Gates*

*Rubber Co.,* 833 F.2d 1406, 1415–17 (10th Cir.1987) ("[I]ncidents of racial harassment which may, by themselves, be insufficient to support a racially hostile work environment claim can be combined with incidents of sexual harassment to prove a pervasive pattern of discriminatory harassment in violation of Title VII.")).

*Masud v. Rohr-Grove Motors, Inc.*, No. 13 C 6419, 2015 WL 5950712, at *4 (N.D. Ill. Oct. 13, 2015)

"In this case, plaintiff has not attempted to state a discrete harassment or hostile work environment claim for each of her numerous protected characteristics, and the evidence, viewed in the light most favorable to plaintiff, supports a pervasive pattern of discriminatory harassment based on not one but various protected characteristics all at once

*Masud v. Rohr-Grove Motors, Inc.*, No. 13 C 6419, 2015 WL 5950712, at *4 (N.D. Ill. Oct. 13, 2015)

### 3. Harassment Targeted at Someone Else Can Still Support Plaintiff's Hostile Work Environment Claim.

"In examining the totality of the circumstances, the court can consider conduct targeted at those other than Plaintiff ... [but the weight of such] 'second hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff." *Brown v. Hous., Auth. of Calvert County,* 150 F.Supp.2d 856, 863 (D.Md.2001) (citing *McPhaul v. Bd. of Comm'rs of Madison County,* 226 F.3d 558, 567 (7th Cir.2000)). *See also Adusumilli v. City of Chicago,* 164 F.3d 353, 362 (7th Cir.1998); *Hirase-Doi v. U.S. West Communications, Inc.,* 61 F.3d 777, 782 (10th Cir.1995); and *Hall v. Gus Constr. Co.,* 842 F.2d 1010, 1015 (8th Cir.1988) and cases cited therein. Thus, an act against an employee other than Plaintiff may be considered for purposes of determining the timeliness of her hostile work environment charge. Such an act, however, must have actually contributed to the hostile work environment Plaintiff claims to have suffered.

*Hayes v. Lowe's Food Stores, Inc.*, 2005 WL 1258932, at *6 (M.D.N.C. May 26, 2005)

The following events are explicitly identified in the Complaint as occurring on or after that date. The bold headings are added to aid analysis of the timeframe, and do not appear in the Complaint.

**Ongoing since December 17, 2021:** She also saw and experienced a lot of **on-going discrimination** against other faculty and students motivated by and because of race and national origin, **which she reported to Dr. Patil once or twice a month**, from Fall semester 2018 <u>until she was removed from her position.</u> In 2020, for example, in October, she spoke to Dr. Patil about these issues on or about October 8 and October 24. In November 2020, she spoke to Dr. Patil about these issues on or about November 16. <u>**In January 2020[1]**</u>, she spoke to Dr. Patil about these issues on or about January 18 and January 27. ¶ 7 (emphasis added)

**March 2021**: Dr. Patil recommended to Dean Weaver that Dr. Rabelais not be reappointed, which Dean Weaver accepted, leading to Dr. Rabelais' removal from her tenure-track position. ¶ 11

**March 2021**: Dean Terri Weaver refused to support a grant application Dr. Rabelais had prepared, blocking her from obtaining funding. ¶ 98

**March 2021:** Dr. Patil's formal recommendation that Dr. Rabelais be removed from tenure track and not reappointed. ¶ 99

**August 2021**: Dr. Rabelais was removed from her tenure track position and given a one year terminal contract as required by University policy, which requires advance notice of non-reappointment of 12 months. ¶ 111

**August 2022**: Dr. Rabelais is separated from the University  ¶57(b)

According to the Complaint, these actions were taken both "because of" stereotypes of transgender people, as set forth in 42 U.S.C. 2000e-2(a), and also the stereotypes were at least "a motivating factor" as set forth in 42 U.S.C. 2000e-2(m), as well as her opposition to discrimination occurring at UIC.[2] The cause of these actions by Dr. Patil and Dean Weaver towards Plaintiff, and the factors motivating them are described thusly in the Complaint:

> Plaintiff's downhill evaluations and removal from her position occurred because Dr. Patil and Dean Weaver viewed Plaintiff through a stereotypical view of transgender people as 'angry' and troublesome, because of her many complaints regarding discriminatory words and conduct among faculty at UIC, because they were upset at Plaintiff's viewpoint that there was rampant discrimination at UIC

---

[1] The stated date of January 2020 is a transcription error, and should read January 2021, as suggested by the reference to the last months of 2020 prior to referencing the January meetings.

[2] Plaintiff alleges both that these actions were taken "because of" gender identity and retaliation, as set forth in 42 U.S.C. § 2000e-2(a), and that gender identity was at least "a motivating factor," as set forth in 42 U.S.C. 2000e-2(m).

9

> which they were perpetuating and which she opposed, and because of their
> inability to look objectively at the bias and its effects on students of color, and
> its effects on her as a transgender woman.

Complaint ¶ 13. Thus, taking these allegations as true and according all reasonable inferences to

Plaintiff, the actions listed above as having occurred within the limitations period satisfy the

Morgan requirements for looking back at previous acts prior to the limitations period. Not all of

the events constituting the hostile work environment are listed in the complaint. Plaintiff need

only cite enough examples to make it plausible that such discrimination occurred, and Plaintiff

is also constrained by Rule 8 requiring "a short and plain statement" that is sufficient to put

Defendant on notice. As it is, the Complaint is quite long at 25 pages.

### 4. <u>Same Employment Practice</u>

The argument that the prior incidents are not part of the same employment practice construes

the term "employment practices" unduly narrowly in the context of HWE. Defendant has not

shown that the incidents comprising the hostile work environment were not the same. *McKinney*

*v. Chicago Transit Auth.*, 2023 WL 5152667, at *4 (N.D. Ill. Aug. 10, 2023) (Defendant "has

not shown that the [ ] incidents were not part of the same retaliatory hostile work environment

practice as the pre-August 2019 incidents.)

> Because "incidents constituting a hostile work environment are part of one unlawful
> employment practice, the employer may be liable for all acts that are part of this single
> claim." *Id.* at 118. As a result, to submit a timely charge, "the employee need only file a
> charge within ... 300 days of any act that is part of the hostile work environment." *Id.*
>
> Thus, **"*Morgan* taught that, in general, 'the entire hostile work environment
> encompasses a single unlawful employment practice,' but cautioned that acts
> bearing 'no relation' to one another would belong to separate employment
> practices."** *Ford [v. Marion County Sheriff's Office], 942 F.3d 839, 852 (7th Cir. 2019)*
> (quoting *Morgan*, 536 U.S. at 117-18). Applying *Morgan*, the Seventh Circuit has
> identified various factors that should guide the "relatedness" inquiry, including whether
> there is a gap in time between incidents, change in management, or prompt and
> appropriate correction by the employer. *Ford*, 942 F.3d at 852-54; *Morgan*, 536 U.S. at
> 118 (an incident that "had no relation to the [other] acts ..., or for some other reason,

10

such as certain intervening action by the employer, was no longer part of the same hostile environment claim" could sever a hostile work environment claim).

*McKinney v. Chicago Transit Auth.*, 2023 WL 5152667, at *4 (N.D. Ill. Aug. 10, 2023)

5. <u>**Why Misgendering a Transgender Employee Consistently Despite the Passage of Time is part of a Hostile Work Environment.**</u>

Courts and scientific studies have found that persistent misgendering of a transgender person is severely disparaging to transgender people . Both scientific studies and case law have shown that misgendering is very hurtful, disparaging and hostile towards transgender people. See McLemore, K. A. (2018). A minority stress perspective on transgender individuals' experiences with misgendering, Stigma and Health, Vol 3, 53-64 (2018) (higher frequency of misgendering associated with serious psychological distress); Kevin A. McLemore, Experiences with Misgendering: Identity Misclassification of Transgender Spectrum Individuals, Self and Identity, Vol 14, 51-74 (2015) (higher frequency with which participants were misgendered was associated with feeling much more negatively about themselves and their gender identity and with more hostility). "Courts addressing the issue have almost uniformly found the practice hostile, objectively offensive, and degrading" Chan Tov McNamara, Misgendering as Misconduct, 68 UCLA L. Rev. Disc. 40, 43 [2020]. See also Stanley v. City of New York, 2020 WL 7776484 at *7 (N.Y. Sup. 2020) (collecting cases).

Ultimately, the question is not how many incidents there were, but whether they altered the terms and conditions of Plaintiff's employment. Grimes v. Cnty. of Cook, 2022 WL 1641887, at *9 (N.D. Ill. 2022) ("That a co-worker misgendered Grimes by calling him "girl" several times also supports his claim.") citing Doe v. Triangle Doughnuts, LLC, 472 F. Supp. 3d 115, 129 (E.D. Pa. 2020) (holding that co-workers' repeated misgendering of a transgender plaintiff supports a hostile work environment claim)

11

"[W]hen the incidents are extremely frequent, particularly over such a short period of time, it is reasonable to infer that work conditions were 'altered for the worse.'"

Pape v. Dircksen & Talleyrand Inc., at *18 (E.D.N.Y. 2019), report and recommendation adopted, 2019 WL 1441125 (E.D.N.Y. 2019)  However, Plaintiff can understand from Defendant's brief why it believes this insufficient. Plaintiff requests an allowance to replead, and to include the following information that will alleviate Defendant's concern.

The Complaint alleges that Dr. Rabelais saw and experienced on-going discrimination against other faculty and students motivated by and because of race and national origin, which she reported to Dr. Patil once or twice a month, from Fall semester 2018 until she was removed from her position. ¶ 7. She continued to see and experience such behavior, and to report it to Dr. Patil after December 17, 2020. For example, in February 2021, after Defendant returned to hybrid learning, and then on-campus learning, she spoke to Dr. Patil about seeing and experiencing acts of harassment and discrimination against others based on race and national origin, on February 24, March 18 and March 30.

On February 5, 2021, Dr. Rabelais was misgendered multiple times by several people in a meeting that included Deans and Department Heads of the College of Nursing, including her own supervisors who misgendered her.

Dr. Rabelais met with Full Professor Carrie Klima several times, in which she repeatedly misgendered Dr. Rabelais, and deadnamed3 her, in front of others. These meetings took place on the following dates in 2021, including February 2, February 16, March 10, and April 20, 2021

These events, occurring with the 300 day limits, will, upon repleading, provide the necessary connection to the other prior events.

---

[3] "Deadnaming" refers to the use of a transgender person's name prior to gender transition, which transgender women find particularly offensive.

6. <u>**Evidence That Other Acts and Words Were Motivated By Sex and/or Gender Identity**</u>

After this incident, which occurred on October 24, 2018, Plaintiff immediately complained to her department's diversity officer, Executive Associate Dean Lorna Finnegan, of this harassment by the two staff members, plainly motivated by her sex and/or gender identity. ¶ 39 The diversity officer told Plaintiff about three weeks later that "she was unable to do anything" to address the transphobic assault by Ms. Carter and Ms. Reynolds. ¶ 43 Three days before that, however, Plaintiff's department head, Crystal Patil, called Plaintiff to a meeting and charged her with a violation of the University Code of Conduct for become angry when assaulted by the staff members and using the words "I'm not a fucking[4] Sir" while she was being misgendered and assaulted. ¶ 41.

> Where a comment crosses the line from gender specific to evidencing gender animus is blurry and depends on the factual context. "That woman needs to talk to her supervisor" is different than "that woman is undeserving of employment" (a discriminatory inference depends on why she is undeserving), which is different still than "I'm going to slap that woman." The permissible inferences could shift further depending on the speaker's conduct with other females, his history with whom the speech references, or a host of other factors. "When a word is ambiguous, context is everything." *Galloway v. Gen. Motors Serv. Parts Operations,* 78 F.3d 1164, 1168 (7th Cir.1996).

*Hall v. City of Chicago*, 713 F.3d 325, 334–35 (7th Cir. 2013); *Accord Williams v. DeJoy*, 2024 WL 3082693, at *4 (S.D. Ind. June 20, 2024), citing *Brooks v. Avancez*, 39

---

[4] The use of bad language by Plaintiff does not vitiate the illegal conduct against Plaintiff. "[T]here is no principle of law, or for that matter of psychology, that decrees that the use of bad language automatically demonstrates the user's insensitivity to like language directed against himself or herself." Carr, 32 F.3d at 1011; see also Zorn v. Helene Curtis, Inc., 903 F.Supp. 1226, 1242 n. 17 (N.D.Ill.1995); cf. Swentek v. USAIR Inc., 830 F.2d 552, 557 (4th Cir.1987). Galloway v. Gen. Motors Serv. Parts Operations, 78 F.3d 1164, 1167 (7th Cir. 1996), abrogated by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002)

13

F.4th 424, 441 (7th Cir. 2022) ("a series of separate , isolated acts can collectively add

up to a hostile work environment")

### 7. **Anti-Trans and Retaliatory Purpose of Charge Against Rabelais**

The anti-transgender and retaliatory purpose of the violation charge is manifest from Dr.

Patil's statements during the meeting, giving all reasonable inferences to the Plaintiff. Although

Dr. Patil knew from Plaintiff complaint to her that Ms. Reynolds and Ms. Carter had

intentionally misgendered and assaulted Plaintiff and placed her in reasonable fear of her

physical safety, Dr. Patil deliberately ignored this knowledge. She stated that "it didn't matter"

that Ms. Reynolds or Ms. Carter had confronted Plaintiff physically, shouting abuse, blocking

her way to the restroom, and putting her in reasonable fear of unwanted touching or injury.

Where the surrounding circumstances include deliberately ignoring harassment based on a

protected class, "a failure to investigate can constitute an adverse employment action." *Leffler v.*

*Children's Hospital of Chicago*, 2023 WL 6461365 at *4 (N.D.Ill.2023) (citing *Knox* v. *State of*

*Ind.*, 93 F.3d 1327, 1334 (7th Cir. 1996) ("It is well established that an employer can be held

liable under Title VII for ... harassment by an employee's co-workers if the employer had actual

or constructive knowledge of the harassment and failed to address the problem adequately.").

Both Dr. Patil and Dean Finnegan had such knowledge, and yet refused to act to address Dr.

Rabelais' complaint. ¶ 122. In fact, far from being charged with a violation of the University

Code of Conduct, the two staff members were given a promotion and a raise in salary. ¶ _ Dr.

Rabelais, on the other hand, continued to experience harassment and discriminatory and

retaliatory behavior, including from Dr. Patil, leading to her termination.

14

**B. Plaintiff pleads conduct that rises to the level of a hostile work environment.**

**1. Required Nexus With Gender Identity/Sex and Retaliation**

On this motion to dismiss, Plaintiff must plausibly show that there was a connection between the sex-neutral conduct and statements, on the one hand, and evidence plausibly suggesting a nexus between the conduct and statements and the related, but distinct categories of sex and/or gender identity. The Seventh Circuit has put it this way:

> Thus, Hall must also produce something more to suggest that, among the various explanations for Johnson's actions, he was motivated by gender. See, e.g., Davis v. Team Elec. Co., 520 F.3d 1080, 1095–96 (9th Cir.2008) (reversing summary judgment in case where only female electrician was given more hazardous jobs and forbidden from certain meetings because the magistrate judge did not adequately consider comments like "this is a man's working world out here," "astrobitch," and "[w]e don't mind if females are working as long as they don't complain").

*Hall v. City of Chicago*, 713 F.3d 325, 333 (7th Cir. 2013). Thus, in the incident referenced above between Plaintiff and the two staff members, Plaintiff must bring forth evidence plausibly suggesting the sex and/or gender identity motivated the conduct. The conduct here is the blocking of her path and crowding her as a disabled person who walks with a cane, and the reasonable concern that unwanted touching and physical injury might occur, about which any reasonable transgender woman would have concern. That evidence consists of the statements alleged in the Complaint:

- "shouted at her about her gender identity" ¶ 5

- "asking invasive questions about her bathroom use" ¶ 33

- "Ms. Reynolds and Ms. Carter also misgendered Dr. Rabelais, referring to her as 'him' and 'Sir,' with sufficient emphasis to make it clear to anyone listening that the misgendering had the intent and effect of harassing Dr. Rabelais. ¶ 36

15

- "they 'did not care' what Dr. Rabelais' pronouns were." ¶37

These allegations in the Complaint regarding the two staff members, Ms. Reynolds and Ms. Carter, plausibly suggest that their sex-neutral actions, of crowding and blocking Plaintiff and shouting at her, had harassment motivated by sex and/or gender identity as a purpose of their actions.

## 2. <u>The Reasonable Transgender Woman Standard</u>

The standard under which the hostility of the environment should be judged is from Plaintiff's perspective. That is, from the perspective of a transgender woman who, after years of struggling with gender issues that are all too often considered shameful in our society, and serious consideration, she finally came out to live as her authentic self, and has to endure a great adjustment period crossing that great divide between male and female, would these events objectively be considered severe or pervasive?

The Supreme Court has instructed that courts must use the "careful consideration of the social context in which particular behavior occurs and is experienced by its target," Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81–82 (1998). The social and legal understanding of transgender people has shifted rapidly over the past twenty years. That rapid change in the social and workplace environment means that our understanding of the impact of the workplace behavior of misgendering must also change. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.

Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex,

and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

*Id*. at 82.

### C. The Failure to Obtain an IDHR Notice of Right to Sue As a Result of the Agency's Misleading Plantiff as to the Ability to Obtain It Does Not Deprive the Court of Jurisdiction.

Defendant argues that the Court does not have the jurisdiction to proceed with IDHA claims. However, when given the chance to replead, Plaintiff would attach to the Complaint correspondence with the IDHR within 12 days forwarding to them the EEOC Notice of Right to Sue. No response was received from IHDR. Plaintiff would also attach correspondence from the Charge Processing Division of IDHR stating, upon Plaintiff's request for a Notice of Right to Sue, that they would not issue a notice of right to sue, because Plaintiff had already received one.

Where an administrative agency actively misleads a plaintiff, resulting in untimely or incomplete administrative process, the Court is not deprived of jurisdiction because the plaintiff did not receive due process of law. *Grimm v. Calicas*, 2017 IL 120105, ¶¶ 24–28, (Ill. 2015). The court found that because the agency misled the plaintiff, the plaintiff did not receive due process. Therefore, the failure to timely file her complaint for administrative review did not deprive the trial court of jurisdiction. Id. ¶ 28.

### *CONCLUSION*

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's Motion, or, if the motion is granted in whole or part, Plaintiff requests the opportunity to file an amended complaint.

October 10, 2024

Respectfully submitted,

/s/ Jillian T. Weiss
**JILLIAN T. WEISS**
LAW OFFICE OF JILLIAN T. WEISS, PC
242 Main Street, No. 304
Beacon, New York 12508
Telephone: (845) 709-3237
Facsimile: (845) 684-0160
jweiss@jtweisslaw.com

*Attorney for Plaintiff*

18